Case 14-1021, et al. Mike-sell's Potato Chip Company Petitioner v. National Labor Relations Board Ms. Asbrock for the petitioner, Mr. Jost for the respondent Good morning. May it please the Court. This case arose when Teamsters Local 957 filed unfair labor practice charges against Mike-sell's Potato Chip Company, alleging that the company unilaterally implemented and unlawfully implemented its last, best, and final offers for two bargaining units. The lawfulness of the company's implementation depends on whether the parties were at impasse as of November 19, 2012, which is the date of implementation. The ALJ and the NLRB found that no impasse existed, but the record as a whole does not contain substantial evidence to support this finding. Can I ask just one thing, and I recognize it's outside the record, but what happened after March 20, 2013? It is outside the record, Your Honor, but the parties met, I believe, one or two additional times in April, I want to say, they then did not meet again until June of 2013, the parties then did not meet again until December of 2013, and the parties then did not meet again until June of 2014. Okay, so you're still operating then under the board's order at this point? Yes, that is correct, under the implemented terms, and no further negotiations have been had since June of 2014. And when do you say the impasse actually happened? Was it the 14th, the 15th, the 17th of November? When did it actually happen? The company believes it had submitted its last, best, and final offer as of November 14. At that meeting, there is evidence that Ms. Willie asked the union to take its offer to a vote. To the extent that that was not clear, the very next day, Ms. Willie confirmed in writing that its last offer, the company's last offer was as last, best, and final. November 15th. In a letter of the 15th. Isn't that the exact same day in the warehouse negotiations? You said, you know what, let's take these difficult issues of pensions and health care, at least, over to, and we'll deal with that in the root driver negotiations. November 15th was the same day. Why would you say that there if, in fact, you actually thought you were at an impasse in those negotiations? The union, for the first time during the November 15th negotiations, said that they wanted to defer the issue of health care and pensions to the route sales. At that point, the company did agree to that. But at that point, it brought the same impasse to fruition with the warehouse unit that already existed for the over-the-road and the route sales. The impasse, however, became even more clear when during, after the November 14th session, the union failed to provide any additional bargaining dates for some time and did not indicate any particular willingness to be open to further compromise on specific issues. That's why this case is very similar to the case of TrueServe, where the employer, just as here, put the union on notice that it sought to address significant financial difficulties at the very outset of negotiations. Negotiations in that case occurred only over a six-week period, and at the end of which the employer informed the union that it would implement its final offer if the last, best, and final offer was not accepted by the date that the current agreement expired. And this court overruled the board's finding of no impasse. But you didn't say in this case, you didn't say what the employer did in TrueServe. The employer in TrueServe told, at the time, extended the final offer and explained to the union. On November 14th, you never said you were at impasse and your offer was the last, final offer. On November 14th, there is evidence and testimony that the company asked the union to vote its offer. That is true, that the company did not utter the words last, best, and final offer on the November 14th session. To the extent that a request to go vote on the proposal was not clear as a last, best, and final offer. Of course not. Your Honor, the company would contend it became clear, if not on the 14th, then on the 15th, when Sharon Willey sent a letter to the union, hand-delivered, that the parties, that its last proposal was its last, best, and final, and requested the union to go vote. However, the... Your Honor, this request that the union vote is irrelevant. In fact, you can't even legally require that. That is true. You know that. So, in fact, if you were to insist on that to the point of impasse, that would be an unfair labor practice. You know that. So, I don't understand why this request that the union vote on it is somehow translated into a last, best, final offer. Well, it is not, it is certainly not something that can be required. Right, Your Honor? However, as in true serve, it can be a fact for consideration of whether an impasse exists, if the union, you know, refuses to even submit a final offer submitted by the company for a vote. And that was a fact that this court considered in true serve. Again, in Laurel Bay, this court reversed the board's finding that the parties were not at impasse at the time of unilateral implementation. The parties in Laurel Bay, just as the parties here, were at loggerheads specifically over benefit fund increases, among other things. And just as in this case, neither party in Laurel Bay budged on its benefit plan position before the employer announced that it had already extended its last, best, and final offer. It's just out of curiosity, was your firm representing the company through this process? During negotiations, no, Your Honor. Yes, somehow or other, I suspected that. Thank you, Your Honor. And I noticed that the union brought in counsel to sit in. The union did, during the last negotiation session of November 14th, bring in counsel to sit in. And that counsel admitted at the end of that session that the parties had not moved the ball very far. He also conveniently forgot his calendar and could not set additional dates. And the union, at no time between the final bargaining session and the date of implementation on November 19th, got back with the company on additional bargaining dates. There was no communication of that whatsoever until November 26th, at which time the implementation had already happened, and suddenly the union saw fit to perhaps become more flexible and propose a date of December 5th to meet again. Have the financial difficulties been clear at the time that the, I guess it's the union, that proposed the start of bargaining weeks after the company could have proposed it? Was the company's financial situation apparent at that time? When bargaining began, Your Honor? Yes. Yes, sir. As a matter of fact— Why the slow motion at that stage? The slow motion of what? I'm sorry. Of the company, in terms of getting negotiations going. Oh, it— I mean, you think it would be— I'm sorry. I misunderstood. —a persistent deal. We've got to get this— Yes, Judge Williams. The company did propose that the parties start meeting in August, early August. However, to open it even further, in July, it was the union that first made reference that it wanted to amend the agreement, which it's usually the union's first move to do that. In early August, the company replied and suggested— I thought it was mid-August, and that you weren't ready to actually meet until the very end of August. Am I wrong on recalling the record that way? Your Honor, that may be the case. Okay. That may be the case. I apologize. It is—it was in August. In that same month, the company was willing to meet. The union could not meet until September. And, again, there were several sets of negotiations. The route sales negotiations, they were not available to meet, they said, until October 10th. And Mike Sells entered the 2012— Your Honors, I see I need to save some of my time for rebuttal. We'll give you a couple minutes. Go ahead. Thank you. Mike Sells entered the 2012 negotiations with a four-year loss of over $5.5 million. It had already been forced to shut down several distribution centers and eliminate half the bargaining unit. This information was known and volunteered to the union at the outset of negotiations in all three groups. What was the default? Do I understand the record correctly that when November 16th or 19th came and the prior collective bargaining agreement expired, that the agreement itself provided that it would actually—the terms would actually continue until you had a new replacement agreement or, obviously, impasse. Is that correct? Well— You had agreed to keep adhering to this even if you hadn't negotiated a new agreement by the time it expired. We would take the position that an impasse would accept that. But otherwise—well, but then the question becomes whether you wanted out of this thing. You didn't want to uphold your commitment for even a day to continue the terms of the prior collective bargaining agreement. And so you had every incentive to declare an impasse at the first opportunity. Well, we would take objection to that. The board upheld ALJ's decision without regard to the finding of any sort of artificial deadline. And so we would first contend that this court, if it were to— Anyway, you spend a lot of time in your briefs talking about the union dragging its heels, and it occurs to me that there are actually incentives on both sides. You were in a hurry to get out of your agreement, even though you promised that you would adhere to those terms while good-faith efforts were negotiated. Well, actually, it wouldn't matter whether there was a provision in the contract continuing it, because under the law, you wouldn't be capable of changing the terms of the contract, in any event, without an impasse. That is correct. So I don't think that's of any legal significance. To address—I'm sorry. That's okay. Thank you. But you did have every incentive economically of getting it out. Well, and to address that issue, it is true the company did not have the luxury of delay. That's why at the very outset it set forth its parameters, its major goals of changing the commission structure, but health care and pension were the biggies for the company with all three groups of employees. And the company provided financial information to the union up front, who took this information at face value and never questioned it, never asked for additional information. And at the same time— Well, you also had a big fight over this gross to net on compensation, an unusual use of the word net. It took me a while to figure out what you were talking about. Yes, Your Honor. I know that that can be kind of confusing, so we tried to explain it as best we could in our briefs. I'm happy to explain further if that's— No, I think I understand it. But the last-minute change from gross to net on the union's part did not avoid an impasse because while the union accepted the concept of net commissions, this was only one of the three key issues where major concessions were needed. But you had a pretty significant movement by the union on November 14th on one of the most difficultly contested issues in bargaining. So how on earth can we determine from that or determine that there was no substantial evidence for the board to see in those events that there was not an impasse on November 14th, 15th, 16th, whichever day you're picking? On the issue of changing from gross to net, that was a shift. However, there again were three key issues here. The union made absolutely no movement at all, still to date has not, on its health care— I know, but you can't have an impasse declared— yes, there were three contentious issues, but as long as you're still making progress on at least one of those, you're not at an impasse. Even if—let's assume that the other two were just not moving at all. You're not at an impasse when you're moving on one. Unless you were to state that the other two issues are so important that we don't even care about the gross to net, we have to get relief on the health and pension, we have to have it now. The company did convey that very clearly. No, no, no, it didn't convey it very clearly. It didn't convey it very clearly on November 14th. That's the problem. In fact, you came back with a counteroffer on the gross to net. That is true. They were trying to get an agreement. Well, that's the problem. Of course you're trying to get— Well, the goal here for the company— The union also made a new offer on health care. You made a new offer on pensions. It was a busy day on the 14th. It was a busy day, but the company had already moved as far as it was willing to move. And it sought to get the union to accept its last, best, and final offer. And that's why it wanted—the company never wanted an impasse. It wanted a contract. Well, wait a minute. Wait a minute. In response to the union's shift from gross to net, you said, Well, okay, we'll take—then we'll go to the 14.5 percent rather than the 15. And we'll give this only if the drivers end up with 3 percent more business. That is correct. So you're coming—they're coming in with one of the three issues. And you're responding with a counterproposal at that point. Yes, Your Honor. The company did come back with what was its last and best offer on that date. You didn't say it on the 14th. That is true. Those words were not uttered. But those words alone, Your Honor, as you know, are not the magic words that always create an impasse. No, that's true, but I can't—if I were the union negotiator, of course, and we know the union has an incentive to try to drag this out. Yes. But I wouldn't have thought at the end of the 14th that we were at impasse. That's the problem. That—and I believe that that is why the company followed up the very next day with— on its comment previously to go vote the—or to go vote the proposal with the letter on November 15th. You understand, Counsel, that a go vote is not relevant at all. I understand— Well, I know we did say it as a factor, but a company can't even insist on that. And that's certainly not equivalent to suggesting it's a final offer. To the extent that was not clear, it was made clear the very next day. And the company sought to, again, meet with the union on several occasions, but it was—the union sat on its hands and gave no response whatsoever. There was no indication that the union was further willing to compromise its position on a specific issue. And that's what has been found, for example, in Wayneview, on which the board heavily relies. The union, at the final bargaining session, softened its position on all three issues that were in contention for the employer. It gave the—it asked the employer for additional dates. It provided its cell number for the employer and to two mediators, which, by the way, the union had invited in to help with the final session. And then later that day, the employer faxed a regressive proposal, which it suddenly termed its last, best, and final offer, and it refused to meet with the union further. And the employer then claimed impasse on a single issue, which led to a heightened burden of proof as to the impasse. There's also another case—I'm sorry, I see that I'm way over, Your Honor. Do you have more questions? No. Okay. We'll give you a couple minutes for rebuttal. Thank you. Okay. Shall we? You can wind up. Wind up. Absolutely. Thirty seconds. Sure. With this said, Your Honor, and I have more to say about the cases cited by the board, there was no expressed— I don't understand why you make a big deal about the ALJ talking about the alleged post-impact discussion when the board, by its footnote, dispensed with that. Why are you making a point of it? Oh, I don't believe that I have a moral argument. In the briefs, we did that simply to reserve the argument and to make sure that the board did not plan to rely on it in its brief. It was a preemptive measure that, as we discussed in our reply, to the extent that that is not an argument the board is making, then we don't see that as an issue anymore. And for these reasons, the petition for review should be granted. Thank you. Mr. Jost? Did I say it right? Is it Jost or Jost? Jost. I apologize. You can raise that podium. Thank you. May it please the Court, my name is Micah Jost for the NLRB. I'd like to begin by addressing a few factual matters that were raised by opposing counsel. First of all, with regard to when the letters were exchanged initially, the union did indeed send its letter on July 2nd. The company responded August 13th. Those letters can be found at Joint Appendix 81 and 83. The employer at that time proposed meeting dates at the end of August and the beginning of September. Is it right that it took the union 10 days to get back with a new negotiating date, or I guess 12 days after the 14th? Given the sort of ‑‑ oh, you mean in November, Your Honor? Yes, between November. She said November 14th to November 20th. They didn't get a response until the 26th. That's not the credited evidence, Your Honor. I'm sorry, I can't hear you, counsel. I apologize. Yes, at Joint Appendix 747, which is the ALJ's decision, the ALJ notes that the union, in fact, responded with a date of proposing an earlier date, November 27, and that response was provided within days of the supposed final offer. What day was that response provided by the union? It's not clear what the exact date was, but at Joint Appendix 435, the union states that it was the day after or the day after that, so around the 15th or the 16th, around the same time that the company was claiming that the parties were at impasse. Counsel, how do you distinguish TrueServe and Laurel Bay? Those are our recent cases. They go pretty far in rejecting the board's conclusions on impasse. Your Honor, our primary response to TrueServe would be that these are fact-dependent cases in all instances. Yes, but you know what, though? You try to come out with principles. Yes, Your Honor. It's not sufficient to say they're just fact-dependent cases. Right, and TrueServe, Your Honor, does not disturb the basic principle, which the court recognized after the fact, after TrueServe in the Wayneview case in particular, and that principle is that where the parties have made major shifts in their positions that have opened up new grounds for further bargaining, they're entitled to an opportunity to exhaust those further possibilities in light of the new changes. So you think that was not true in TrueServe or in Laurel Bay? In Laurel Bay, Your Honor, the parties had been deadlocked from the outset. The union had said that its position was not negotiable on health care. The court found that the parties had been at loggerheads for six months, so that case is clearly distinguishable. What about the other one, TrueServe? In TrueServe, Your Honor, the parties were still moving near the end, but from the outset, the company had made very clear that it was only going to make one final offer, and when it did make that final offer, it was crystal clear about the finality of it. In this case, well, in TrueServe, then, the union tried to come back after that and make these empty protestations of flexibility, and that's what we do not have in this case. What we have instead is the parties making fundamental shifts in their basic approach to bargaining. On November 14th? On November 14th, Your Honor, the union made a basic shift, a fundamental change in its approach to the bargaining, which is the exact criteria that the court looked for in Wayneview, where the union shifted, and this was the quintessential sort of back-and-forth between the parties that characterizes good-faith productive bargaining. On that day, they started out talking about one-year agreements. The company began by making an increase in the net percentage it was willing to pay for a one-year agreement, and that spurred a response from the union. After the company made clear, we absolutely need net, the union acted in response to that, and that's, again, similar to what we have in Wayneview, where the parties are listening to each other and are acting in a way that addresses the other party's concerns and then opens up new territory. The company's got some real concerns, though, that the union was deliberately dragging its feet. Time is on its side. It gets to keep these terms as long as the negotiations keep going. How are we supposed to, how did the board assuage that concern? Your Honor, first of all, as was noted earlier, both sides have incentives here. The company's incentive is to rush to impasse. The union's incentive would be to drag it out. The question is, what does the objective evidence show about what those incentives led the parties to do? The union gets the default rule. Well, but the company also has the ultimate advantage in terms of being able to put its terms in effect at some point. Does it make any difference, has the board considered at all, that the situation can be different when the company is faced with financial difficulties, which, of course, they disclosed, they gave their books to the union. And does it make a difference when a company is financially in a difficult position and is seeking a reduction in the compensation, whether it's wages, pension, or health benefit? As compared to the original scenario for the impasse rule, which was a context when employers and unions were always bargaining for increases. So there's a different world today, partly because of pension and health costs, which changes the incentives because the original notion of an employer having the right to put in his last best offer was designed to give the employer a weapon vis-à-vis the union. This is not that kind of situation. The employer's not looking for a weapon, he's looking for survival. Your Honor, I have two points in response to that. The first is that the law does recognize an exception to the impasse doctrine for exigent circumstances. When there are substantial business justifications that require the employer to act immediately, then, yes, the employer does have the flexibility to do that. Well, why wasn't that a factor to be considered? After all, the employer had just recently laid off 30 route drivers. That's right, Your Honor. And by doing so, it had opened up future cost savings to itself. At that rate, it could eliminate all its employees and save a lot of costs. Your Honor, it has the right to do that. They didn't invoke this exception, did they? That's exactly right. This is an exception that doesn't come into play here. And the employer's delay in actually initiating the bargaining demonstrates that it was not actually under the sort of exigencies that it claimed. The second point, Your Honor, is that the parties still retain other weapons, even if the employer was not entitled to implement unilaterally. It still could have engaged in a lockout. The union could have engaged in a strike. The parties still have the ability to bring pressure to bear on the other side if they feel that the other side is not being sufficiently conciliatory. The factor that I'd like to focus on. I'm amused to see in today's paper that the union's suggestion that the company move to the central state pension. I don't know if anybody read the paper today, but central states has just indicated that it's going to have to reduce the pensions for existing pensioners because their funds are not adequate to deal with pensions. So that would not have, in hindsight, that would not have been a very… I understand that central states is in dire straits based on the current news. It's not just hindsight. The employer was already worried at the time of negotiations that central states was going to make things worse. That's right. And the parties have continued to be with central states. The question was only about who would be paying what. And the critical fact for the Court's consideration is that at that last root sales meeting on November 14th, the company dropped significantly from its initial request that the employees pay $91.10, which was half, all the way down to $13.50. So for them to claim that there was no movement going on is not reflected by the record. The momentum that the parties had from these back and forths was only stopped by, or paused rather, by the fact that the parties had to get to bed. Why wasn't there an impasse on February 13th? Pensions had to be resolved. There had been no new pension proposal, as I understand it, since November 19th. You had a strike vote about 10 days after the 13th. Why isn't that when the impasse happened? Your Honor, it does appear that the company, as sort of an afterthought, argues that there was some sort of subsequent delay, or excuse me, subsequent impasse. And as the Board noted in the final footnote, first of all, the company did not meet the legal standards that are set forth in the dependable maintenance case. By actually telling the union, we believe that even if we weren't at impasse before, now we are. Well, they'd already told them in November they thought they were at impasse. And they weren't, Your Honor. Do we have to say it again? That was a violation of the law for them to impose their terms at that time when they, in fact, were not at impasse. But the union already knew that they thought they were at impasse. Well, the company claimed that, but the actual— No, no, the union had already been told by the company that, from the company's viewpoint, they were at an impasse. So I don't know why you have to say it again. The key, though, is— You've got a strike vote. You've got no movement on pensions unless you're aware of something since November. Your Honor, as far as I know, the parties set pensions aside, but they continue to make progress on both health care and— Yeah, but you're not going to have an agreement. If you don't resolve pensions, you have to have pensions to have an agreement. Your Honor, these are fungible money issues. This is, as in the Grinnell case, this is a matter of dollars. The money that the union was proposing to add to its health care offer is money that the company could have just as well put towards the pensions. The fact is that negotiations were still in flux, and there's no sort of indication. The standard, as set forth in Wayneview, is that for a single issue to cause a deadlock overall, it has to lead to a breakdown of negotiations. That's not what we have here. To the extent that the parties— Why wasn't there a breakdown by mid-February? The parties were still moving. The record shows— You had a strike vote. What is the significance of the strike vote? A strike vote, I believe, could be one of the factors that could be considered here. Isn't it pretty powerful evidence that they were resorting to alternative means for the very, very weighty pressure? They were going to a whole new level of pressure against the employer? Your Honor, the possibility of a strike is always on the table. The fact that the union considered a strike, it did not ultimately announce a strike. It never took strike action. So the fact that the union was contemplating that internally doesn't weigh heavily in the analysis here. Did the board explain all that? The board's analysis is relatively brief, as is the argument that the company makes on this point. Again, it's essentially an afterthought. I don't know that it's our job to characterize things as afterthought just because they aren't Roman numeral I or II in a brief. But they have a few powerful points here. And there's not, as you said, a whole lot of response from the board. The points that I would note, Your Honor, are continued improvement in the union's commission offer on January 22nd, which you can see at Joint Appendix. Would you speak a little louder, please? Excuse me, Your Honor. I would point to the continued improvement in the union's commission offer, which is at Joint Appendix 314. On February 13th, you have the employer changing its offer on non-manufactured products so the parties are able to reach a tentative agreement at 9.5%, which is at Joint Appendix 194. And on February 27th, you have the union for the first time embracing the idea that the future increases from 14.5% to 15%. And you have the union embracing the idea that it would, in fact, take a percentage of increases in sales to make that happen. So you have the union on February 27th going to 1%, then 1.5%. On March 20th, it's 1.75%, and the parties bring in a mediator at the company's request. So at that time, the parties, the factors that we've laid out make clear that the parties were indeed still making movement at that time. The final point that I'd like to emphasize is the contemporaneous understanding of the parties on November 14. As was noted, the parties did not say that anything was final. Willie, in fact, testified that she still hoped to reach an agreement. That's at Joint Appendix 705. And the very next day, when the parties met in the warehouse negotiations, they did indeed agree that they would try to resolve the issues from the root sales negotiations there. So for those reasons, we would ask the court to enforce the board's order in full. Thank you. Ms. Hasbrouck, we'll give you two minutes. Judge Silberman, Your Honors, made a great point that there is a difference when an employer comes into negotiations seeking concessions. It cannot be treated like another situation, because at the time that the employer was seeking concessions, it voluntarily provided a great deal of financial information to the union, which was not questioned. And at the same time, it's undisputed that the union entered negotiations seeking to restore wages and benefits that it felt were lost in the past. And when the union recognized the company's need to cut costs, it sought to avoid the concessions that would inevitably come with a new contract. The union also, however, wanted to avoid the appearance of impasse, which could either result in a lockout or unilateral implementation. And the best way for the union to achieve this delicate balance was to extend negotiations as long as possible. If it had to successfully avoid impasse, it has to make concessions, which it did. It did make a concession on November 14th with regard to the commissions. Again, Judge Williams, there were two additional key issues, one being pensions, where the union never and to date has not changed its position that the company pay the— But you didn't say, if we don't get relief on pensions and health, we cannot continue this agreement. You never said that. That specifically was not said. Throughout negotiations, though, the company did emphasize, and I do believe that there are record citations, that it had to have relief in three areas. One was pensions, one was health care, and one was commissions for the route sales. The health care, too, the union had never, ever entertained the idea of allowing the company to have flexibility in its plan and to exclude covering retirees. Those issues left the health care, you know, deadlocked, despite the fact that the union raised an issue or a proposal regarding a central states plan, which the company explained would cost 20 percent more to the company than what the company was already proposing. For these reasons, Your Honors, I appreciate your time, and we'd ask that the company's petition for review be granted and that the board's petition for enforcement be denied.  The case is submitted. We're going to take a very brief recess before the second case.
judges: Millett, Silberman, Williams